**Not for Publication**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

LOUIS CHILDRESS, JR.,

    *Plaintiff,*

    v.

CITY OF ORANGE TOWNSHIP et al.,

    *Defendants.*

Civil Action No. 14-4354 (JMV) (JBC)

**OPINION**

**John Michael Vazquez, U.S.D.J.**

    This case arises from the termination of a former Assistant City Attorney in the City of Orange Township. Plaintiff Louis Childress, Jr. ("Plaintiff" or "Childress") claims that Defendants Business Administrator Willis Edwards ("Edwards"), City Attorney Daniel Smith ("Smith"), Mayor Dwayne Warren ("Warren"), and City of Orange Township ("Orange") (collectively "Defendants") violated Plaintiff's rights when they terminated him as Assistant City Attorney because he did not support Warren's candidacy for mayor. Defendants move for summary judgment (D.E. 56, 57) pursuant to Federal Rule of Civil Procedure 56. The Court reviewed all submissions,[1] and considered the motions without oral argument pursuant to Fed. R. Civ. P. 78(b)

---

[1] In this Opinion, Plaintiff's Complaint (D.E. 1) will be referred to as "Compl." Defendant Edward's brief in support of his motion for summary judgment (D.E. 56) will be referred to as the "Edwards Br." Defendants Orange, Smith, and Warren's brief in support of their motion for summary judgment (D.E. 57) will be referred to as the "City Br." Plaintiff's brief in opposition (D.E. 61) will be referred to as "Pl. Opp." Defendants Orange, Smith, and Warren's reply brief (D.E. 64) will be referred to as the "City Reply." Defendant Edwards' letter in reply (D.E. 65) will be referred to as the "Edwards Reply."

and L. Civ. R. 78.1(b). For the reasons that follow, Defendants' motions for summary judgment on Count One are **DENIED**. Defendants' motions for summary judgment on Counts Two, Four, and Five are **GRANTED**. Defendants' motions for summary judgment on Counts Three are **GRANTED in part** and **DENIED in part**.

## I. BACKGROUND[2]

Plaintiff began working as an Assistant City Attorney for Orange on April 1, 2002. D.E. 64-1, Plaintiff's Statement of Material Facts ("Pl. SOMF") ¶ 1. Assistant City Attorney is an at-will, unclassified, regular part-time position. Pl. SOMF ¶ 2; D.E. 57-2, City Defendant's Statement of Material Facts ("City Defs. SOMF") ¶ 1 (noting that the "position was unclassified and considered an at will employment position"). Plaintiff first started under the administration of Mayor Mims Hackett, Sr. ("Hackett, Sr.") and continued into the administration of Mayor Eldridge Hawkins, Jr. ("Hawkins"). Pl. SOMF ¶ 3. During both administrations, Plaintiff's supervisor was Marvin Braker, Esq. ("Braker"), the City Attorney for Orange and Irvington. Pl. SOMF ¶ 3. Braker was also the attorney for Irvington. *Id.*

Defendant Warren became Mayor of Orange on July 1, 2012. Pl. SOMF ¶ 4; Def. Resp. ¶ 4. Warren then appointed Defendant Smith as City Attorney. Pl. SOMF ¶ 4; Def. Resp. ¶ 4. Smith and his wife were campaign supporters and contributors of Warren. Pl. SOMF ¶ 4. Between June 1, 2012 and July 1, 2012, Warren met with Plaintiff. Warren claims that Plaintiff informed him that Plaintiff did not plan to stay for Warren's entire term, but that Plaintiff needed to stay employed by Orange long enough to fulfill the required time for Plaintiff's pension. Pl. SOMF ¶ 6. Warren states that he told Plaintiff that he had no problems with this request and that Plaintiff

---

[2] This Opinion cites to Plaintiff's Statement of Material Facts, unless the parties offer differing accounts about the fact(s) or supplemental information is necessary.

2

could stay with Orange for as long as necessary. Pl. SOMF ¶ 7. Warren contends that sometime after their initial conversation, Plaintiff told Warren that he would not be staying in Orange because Braker had a position for him in Irvington. Pl. SOMF ¶ 7. Plaintiff denies this contention, and states that neither Braker nor the Mayor of Irvington offered him a position. Pl. SOMF ¶ 7.

On or about July 1, 2012, Warren appointed Defendant Edwards to be the Business Administrator for Orange. Pl. SOMF ¶ 8. Edwards was the campaign chairperson for Warren's mayoral campaign. Pl. SOMF ¶ 8. Plaintiff testified that on July 5, 2012, Edwards invited Plaintiff to a restaurant in Orange and informed Plaintiff that the new administration needed spots in the Law Department for people who had supported Warren's campaign. Pl. SOMF ¶ 9. Edwards, on the other hand, claims that a week before taking office be became aware the Plaintiff was an Assistant City Attorney. Pl. SOMF ¶ 15. Edwards contends that between July 1 and 2, he unexpectedly encountered Plaintiff at the restaurant. *Id.* Edwards claims that they exchanged pleasantries, Plaintiff indicated that he wished to speak to Edwards, and Edwards responded that his door was always open. *Id.* Edwards contends that this was the extent of their conversation at the restaurant and that they had no further discussions. *Id.*

On July 10, 2012, according to Plaintiff, Edwards called him and stated: "Lou . . . I heard you were going to work for Irvington . . . I thought we were cool." Pl. SOMF ¶ 11. Plaintiff responded that he did not know what Edwards was talking about. *Id.* Edwards then told Plaintiff that Defendant Smith had been fired from his position as the Public Defender for Irvington. *Id.* Plaintiff stated that he did not know Smith worked for Irvington or that Smith had been fired. *Id.* Edwards then told Plaintiff he would look into the matter and get back to Plaintiff. *Id.* Smith testified that the administration or some people in Irvington were not supporters of Warren and that his employment with Irvington had been terminated because it became known that he

supported Warren's campaign. Pl. SOMF ¶ 12. Smith testified that he was upset that he was fired because of an election in a town outside Irvington and that he informed Edwards of the circumstances surrounding his termination by Irvington. Pl. SOMF ¶ 14.

Warren appointed Smith as Orange's City Attorney. Smith stated that between July 1 and July 12, Smith assessed the needs of the Orange Law Department and the available personnel. Pl. SOMF ¶ 16. Warren stated that because Orange was self-insured, Smith chose to replace Plaintiff with an attorney with more experience in insurance defense litigation. Pl. SOMF ¶ 18. Smith further testified that he wanted to hire sometime with municipal self-insurance defense and litigation experience, Pl. SOMF ¶ 18, and that he based his decision to terminate Plaintiff and hire Michael Hackett, Jr. ("Hackett, Jr.") due to his determination that Hackett, Jr. had more relevant experience, Pl. SOMF ¶ 19. Smith further testified that he relied upon the fact that Hackett, Jr. had primarily worked for a law firm that handled automobile defense litigation for insurance companies. Pl. SOMF ¶ 19. Smith stated that Hackett, Jr.'s father, a Warren supporter, had been the mayor of Orange and that he also considered this factor in deciding to terminate Plaintiff and hire Hackett, Jr. Pl. SOMF ¶ 20. Smith stated that on a scale of one to ten, the political aspect of Hackett, Jr.'s father was a two. Pl. SOMF ¶ 20.

On or about July 12, 2012, Smith informed Plaintiff that he would be terminated as Assistant City Attorney effective July 25, 2012. Pl. SOMF ¶ 23. Smith further testified that the campaign between Hawkins and Warren was hard-fought, but that he did not recall whether Plaintiff participated the campaign. Pl. SOMF ¶ 23. Smith, however, did testify that he knew that Plaintiff and Braker, the former City Attorney and a Hawkins supporter, were close. Pl. SOMF ¶ 23.

The duties of the Orange City Attorney are set out in the city's code (the "Code") at Sections 4-29 through 4-32. Pl. SOMF ¶ 4. The Code, however, does not set forth any specific duties or responsibilities for Assistant City Attorneys. Pl. SOMF ¶ 5. The Code provides the following as to City Attorney's duties:

> § 4-29. General powers and duties.
>
>> The City Attorney shall be the legal advisor to the Mayor and all departments except as may be otherwise provided by the Charter. He shall prosecute and defend actions and proceedings by and against the city and every department thereof. In furtherance of these general powers, and without limitation thereto, he shall:
>>
>> A. Advise the Mayor as to the form and sufficiency of all ordinances and resolutions prior to their passage.
>>
>> B. Review and approve all contracts, deeds, documents and instruments prior to the execution thereof by or on behalf of the city.
>>
>> C. Conduct appeals from orders, decisions or judgments affecting any interest of the city as he may, in his discretion, determine to be necessary or desirable, or as directed by the Mayor.
>>
>> D. Subject to the approval of the Council, have the power to enter into any agreement, compromise or settlement of any litigation in which the city is involved.
>>
>> E. Render opinions, in writing, upon any question of law submitted to him by the Mayor, the Business Administrator or the head of any department with respect to his/her official powers and duties.
>>
>> F. Maintain a record of all actions, suits, proceedings and matters which relate to the city's interest and report thereon from time to time as the Mayor may require.
>>
>> G. Conduct, when requested by the Judge of the Municipal Court of the City of Orange Township, prosecutions for crimes and offenses recognizable by the Municipal Court, except such crimes and offenses as it may be the

5

duty of the County Prosecutor to prosecute, including violations of ordinances of the City of Orange Township, complaints of any department under state law and violations of rules and regulations duly promulgated by the Charter or ordinance.

H. Conduct labor negotiations and advise on civil service laws and procedures.

I. Have such other duties and different functions, powers and duties as may be provided by the Charter or ordinance.

Section 4-30 of the Code denotes that the City Attorney is appointed by the Mayor "with the advice and consent of" the town council. Section 4-31, in turn, permits the City Attorney to appoint Assistant City Attorneys so long as the council authorizes the positions. Finally, Section 4-32 states that the City Attorney must work at least thirty-five hours a week and Assistant City Attorneys at least twenty-one hours per week.

As an Assistant City Attorney, Plaintiff was an unclassified regular part-time employee. Pl. SOMF ¶ 5. Section 23:1-3.9(G) of the City of Orange Township Employee Handbook of Personnel Policies and Procedures ("Employee Handbook") defines a regular part-time employee as "[a] provisional, unclassified, temporary, permanent or probationary employee who averages more than 20 hours of work per week, but less than the regular 35 hours per week (Regular Part-time employees may be eligible for benefits on a pro-rated basis)." Pl. SOMF ¶ 5; D.E. 57-2, Ex. B (Employee Handbook). The Employee Handbook also states:

Employment with the City is on an *"at-will" basis*. This means that employment is for no specific term and can be terminated by the employee or the City at any time for any reason or for no reason, with or without notice; subject to provisions of the New Jersey Department of Personnel. All employees, whether regular or temporary, are at-will employees.

*Policies included in this Handbook do not constitute a contract of employment between the City and its employees.* No contractual

6

obligation or liability on the part of the City is intended; no promise of any kind is made. The City retains the right, in its sole discretion, to change any policy, procedure, term of employment, or working condition at any time to the extent permitted by the applicable State and Federal laws.

Employee Handbook at 9 (emphases added). The Employee Handbook also states in a section entitled "Political Activity," that:

It shall be the declared policy of the City to appoint all employees, either classified or unclassified, without regard to political affiliation. For the purpose of this section, municipal employees are defined to include full-time permanent, provisional, probationary and temporary personnel and part-time personnel appointed by the City and receiving annual or hourly compensation for their services from the City.

No employee in the career or executive service may directly or indirectly use or seek to use his/her position to control of affect the political action of another person or engage in political activity during working hours.

*Id.* at Section 23:1-2.7; Pl. SOMF ¶ 16.

## II. PROCEDURAL HISTORY

On July 10, 2014, Plaintiff filed his Complaint. D.E. 1. Defendants Orange, Smith, and Warren filed an Answer on December 16, 2014 (D.E. 6) followed by Defendant Edwards on March 4, 2015 (D.E. 9). On April 10 and April 27, 2015, Defendants filed motions requesting a judgment on the pleadings pursuant to Rule 12(c) (D.E. 13, 18); Judge Arleo denied the motions November 13, 2015 (D.E. 29). The case was reassigned to this Court on February 25, 2016. D.E. 38. Following fact discovery, the Defendants filed their current motions for summary judgment pursuant to Rule 56. D.E. 56, 57.

## III. SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In other words, a court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

## IV. ANALYSIS

Plaintiff brings five counts related to his termination as Assistant City Attorney. Count One applies to all Defendants and claims unlawful political retaliation under the First and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983. Compl. ¶ 18-26. Count Two also applies to all Defendants and asserts violations of Plaintiff's rights to political association under the First and Fourteenth Amendments pursuant to Section 1983 as well as Article I of the New Jersey State Constitution. *Id*. at ¶ 27-33. Count Three alleges a civil conspiracy to deprive Plaintiff of his constitutionally protected rights by Defendants Warren, Edwards, and Smith. *Id*. at ¶ 34-38. Count Four claims violations of substantive due process under the New Jersey Constitution by Defendants Warren, Edwards, and Smith. *Id*. at ¶ 39-40. Count Five claims that all Defendants breached their duty of good faith and fair dealing. *Id*. at ¶ 41-44.

### a. Count One

Count One alleges, in part, that "[b]y subjecting Plaintiff to retaliation based upon political motivation, for the firing of Defendant Smith by the Township of Irvington, the Defendants, violated and continues [sic] to violate the Plaintiff's rights as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution" under Section 1983. Compl. ¶ 23. While Defendants move for judgment as to Count One, they fail to substantively address the allegations of the count. Instead, Defendants focus on the allegations of Count Two. As a result, Defendants' motion for summary judgment on Count One is denied.

### b. Count Two

Count Two alleges, in part, that Defendants violated Plaintiff's rights under the United States and New Jersey Constitutions because "Defendants' retaliatory termination of Plaintiff was based on his support of then incumbent Mayor Hawkins and his failure to support Defendant Mayor Warren." Compl. ¶ 30. Plaintiff asserts Section 1983 as to the United States Constitutional claims. Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

Section 1983 does not provide substantive rights; rather, it provides a vehicle for vindicating violations of other federal rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). In order to state a claim under Section 1983, a plaintiff must demonstrate that "(1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." *Burt v. CFG Health Sys.*, No. 15-2279, 2015 WL 1646849, at *2 (D.N.J. Apr. 14, 2015).

The termination of certain public employees based on their political affiliation violates the First Amendment.[3] *See Branti v. Finkel*, 445 U.S. 507 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976). In *Elrod*, the Supreme Court established that the First Amendment prohibits the termination of certain public employees solely based on their political party affiliation unless political party affiliation is a necessary requirement for the position. Accordingly, the Court's

---

[3] First Amendment rights are incorporated by the Fourteenth Amendment and therefore apply to state actions. *See Gitlow v. New York*, 268 U.S. 652 (1925).

plurality held that public employees in confidential or policy-making positions may be discharged based on political affiliation. 427 U.S. at 367-68; *see id.* at 375 (Stewart, J. concurring) (agreeing that "nonpolicymaking, nonconfidential government employee[s]" may not be terminated based solely on their political beliefs.). In *Branti*, the Supreme Court refined its holding in *Elrod* and ruled that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518; *see also Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265 (3d Cir. 2007. The *Branti* Court explained that party affiliation may be a valid requirement of a position "if an employee's private political beliefs would interfere with the discharge of his public duties." *Id.* at 517. The Third Circuit has recognized that that "[i]n [*Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990)] the Court extended the *Elrod– Branti* doctrine, holding that the First Amendment protects public employees not only from politically motivated discharge, but also from promotion, transfer, recalls, and other hiring decisions conditioned on political affiliation, unless the government can demonstrate that party affiliation is a proper requirement for the position." *Galli*, 490 F.3d at 270–71.

The Third Circuit has further articulated a three-part test, as well as factors to consider, when to examining allegations First Amendment violations based on political affiliation. Concerning the test, the Circuit has indicated as follows:

> To make out a prima facie case, [a party] must show that (1) she was employed at a public agency in a position that does not require political affiliation, (2) she was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision.

*Id.* at 271. The following factors are also relevant: "whether the employee has duties that are non-discretionary or non-technical, participates in discussions or other meetings, prepares budgets, possesses the authority to hire and fire other employees, has a high salary, retains power over others, and can speak in the name of policymakers." *Id.* at 271 (citing *Brown v. Trench*, 787 F.2d 167, 169 (3d Cir. 1986)); *see also Boyle v. Cty. of Allegheny Pennsylvania*, 139 F.3d 386, 396–97 (3d Cir. 1998). Yet, the Third Circuit has indicated that "[t]he key factor seems to be not whether the employee was a supervisor or had a great deal of responsibility, but whether she has meaningful input into decisionmaking concerning the nature and scope of a major program." *Galli*, 490 F.3d at 271 (internal citations and brackets omitted).

However, the Court must also be mindful that "[i]t is not always easy to determine whether political affiliation is a legitimate factor to be considered for a particular job. . . . Each decision is, of course, fact specific for that case." *Zold*, 935 F.2d at 635; *see Elrod*, 427 U.S. at 367 ("No clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical."). Moreover, the governmental entity must establish that political affiliation is a legitimate consideration for the position. *See Branti*, 445 U.S. at 515–16; *Burns v. County of Cambria, Pa.*, 971 F.2d 1015, 1021-22 (3d Cir. 1992); *Galli*, 490 F.3d at 271. The defendants have the "substantial burden of demonstrating that political affiliation is an appropriate requirement for the effective performance of the [position]." *Burns*, 971 F.2d at 1022 (quoting *Zold*, 935 F.2d at 640).

Here Plaintiff contends, and Defendants assume for the purposes of their motions,[4] that

Plaintiff was terminated from his position based on his support for the outgoing mayor instead of

Defendant Warren. The parties' remaining dispute is limited to whether political affiliation is an

appropriate criterion for the position of Assistant City Attorney.

As an initial matter, Plaintiff points out that his termination does not present "the typical

case where the parties are members of different political parties" and argues that cases cited by

Defendants are inapplicable because they consider disputes between persons of different political

parties. Pl. Opp. at 9, 10. However, *Elrod* and its progeny are not limited to inter-party actions.

Courts have also examined *intra-party* political retaliation under the same framework. As the

Third Circuit explained:

> *Elrod* has been traditionally applied to terminations based on an
> employee's different political affiliation. Members of the same party
> are presumed to share common interests and goals, and patronage
> appointments usually come from the same party as the elected
> official. *But identical party affiliation does not necessarily ensure
> the subordinate's loyal adherence to the superior's policies.
> Primary election fights can be famously brutal, sometimes more so
> than contests in the general election, and animosity between
> candidates is likely to result. Recognizing this, other courts of
> appeals have broadened the definition of 'political affiliation' to
> include commonality of political purpose, partisan activity, and
> political support. These courts have upheld terminations under
> Elrod-Branti of policymaking employees who openly supported
> campaigns against their current or subsequently elected employer.*

---

[4] Plaintiff's opposition expends considerable analysis as to why there are genuine issues of
material fact concerning the reasons for Plaintiff's firing. However, for the purposes of the
current motion, Plaintiff's argument is irrelevant because Defendants have conceded the point.
While the City Defendants' SOMF suggests that Plaintiff was terminated "due to a restructuring
and reorganization of the City's law department," City Defs. SOMF ¶ 5, all Defendants assume
that Plaintiff was terminated based on political affiliation in their moving papers, City Br. at 4;
Edwards Br. at 4-11.

*Curinga v. City of Clairton*, 357 F.3d 305, 311 (3d Cir. 2004) (emphasis added) (internal citations omitted); *see D'Aurizio v. Palisades Park*, 963 F. Supp. 387, 393 n.15 (D.N.J. 1997) ("[A]n employee can show a protected political affiliation even if he or she is a member of the same political party as his or her employer so long as the employer and employee are members of competing identifiable factions within that same party." (quoting *Christy v. Pennsylvania Turnpike Commission*, 904 F.Supp. 427, 430 n.3 (E.D.Pa. 1995)), *aff'd sub nom. D'Aurizio v. Borough of Palisades Park*, 151 F.3d 1024 (3d Cir. 1998); *see also Waskovich v. Morgano*, 800 F. Supp. 1220, 1223 (D.N.J. 1992), *aff'd*, 2 F.3d 1292 (3d Cir. 1993). For example, in *Curinga*, the dispute concerned a Democratic municipal manager who campaigned against a Democratic incumbent city council member. *Id.* at 313. Here, the fact that all parties are members of the same political party is not dispositive for either Plaintiff or Defendants.

The Third Circuit has had occasion to address whether *Elrod-Branti* protection extends to publically employed attorneys in a number of cases. In *Ness v. Marshall*, 660 F.2d 517 (3d Cir. 1981), the court considered whether political affiliation was an appropriate requirement for the positions of City Solicitor and Assistant City Solicitor. In the case, the plaintiffs were all appointed to their positions by a Republican mayor and were dismissed by a newly elected Democratic mayor.[5] The attorney plaintiffs denied that they functioned in a policymaking role and characterized "their role in the former administration as performing a kind of purely technical legal work for any official who might request it." *Id.* at 521.

---

[5] Two of the plaintiffs were registered Republicans. The third plaintiff, "although a registered Democrat, had supported his brother, an unsuccessful Republican candidate for the city council, in the 1977 election." *Ness*, 660 F.2d at 518.

Although Judge Gibbons recognized that there may have been a genuine issue of material fact as to the reason the plaintiffs were fired, the *Ness* court nevertheless found that the plaintiff attorneys could be terminated based on political affiliation, finding in part, that

> [i]n this case, we agree with the district court that, *as a matter of law*, the duties imposed on city solicitors by the [City] Code and the undisputed functions entailed by these duties e. g., *rendering legal opinions, drafting ordinances, negotiating contracts define a position for which party affiliation is an appropriate requirement. In relying on an attorney to perform these functions so intimately related to city policy, the mayor has the right to receive the complete cooperation and loyalty of a trusted adviser, and should not be expected to settle for less.* The fact that the solicitors 'wear more than one hat' by doing work requested by other city officials, e.g., the council, who might be of a different party affiliation than the mayor, is not enough to contradict this conclusion.

*Id.* at 522 (emphasis added). The *Ness* court found that even though the solicitors claimed that their actual responsibilities were technical in nature, a future "mayor might rely upon the city solicitors for the legal advice necessary to implement policy. That one mayor may have chosen not to employ the solicitors in this manner should not stand as a bar to future mayors relying on solicitors to the extent allowed by the Code." *Id.* The court also emphasized that under the administrative code, the solicitors served at the pleasure of the mayor.[6] *Id.* Thus, an important lesson from *Ness* is that courts must look to an attorney's potential duties and responsibilities even if the particular attorney is being utilized in a more limited manner.

In *Mammau v. Ranck*, 687 F.2d 9 (3d Cir. 1982), the Third Circuit, in a one paragraph opinion, upheld the district court's determination that an assistant district attorney could be terminated based on political affiliation as a matter of law. *Id.* The court in *Mammau* stated that

---

[6] The *Ness* court lastly noted that the "Pennsylvania Supreme Court has recognized how important it is that public officials having the power to appoint municipal attorneys feel confident in those attorneys." 660 F.2d at 522 (citing *Snyderwine v. Craley*, 434 Pa. 349 (1969); *Naef v. City of Allentown*, 227 A.2d 888, 890-91 (1967)).

it affirmed the district court "essentially for the reasons set forth in [*Ness*]." *Id.* The district court

had found that the duties of assistant district attorneys were "consonant with those of the district

attorney" and included the responsibility to

> sign all bills of indictment and conduct in court all criminal and
> other prosecutions, in the name of the Commonwealth, or, when the
> Commonwealth is a party, which arise in the county for which he is
> elected, and perform all the duties which, prior to May 3, 1850, were
> performed by deputy attorneys general. The duties herein conferred
> shall be in addition to all other duties given to the said district
> attorney by other statutes. They include the power - and the duty -
> to represent the Commonwealth's interests in the enforcement of its
> criminal laws. The district attorney must be allowed to carry out
> this important function without hinderance [sic] from any source.

*Mummau v. Ranck*, 531 F. Supp. 402, 405 (E.D. Pa.), *aff'd*, 687 F.2d 9 (3d Cir. 1982). The Third

Circuit also "specifically reject[ed] appellant's contention that his function was purely technical

and ministerial and that therefore political affiliation would an inappropriate criterion for

employment" because the fact that "an assistant district attorney could conceivably operate in such

a legal/technical manner, or that appellant in fact so limited himself to the role described is

irrelevant." *Mammau*, 687 F.2d at 9. Again, as in *Ness*, the Third Circuit in *Mammau* instructed

courts to look beyond an attorney's actual duties to what the attorney was authorized to perform.

In *Wetzel v. Tucker*, 139 F.2d 380 (3d Cir. 1998), the Third Circuit held that the

Northeastern Pennsylvania Hospital and Education Authority's termination of the Authority's

solicitor on the basis of political affiliation did not violate the First Amendment. After finding that

the Authority was a policy-making body, the court determined that there was "no material

difference between the roles played by the attorneys in *Ness* and *Mummau*" and the plaintiff

solicitor. *Id.* at 385. The court noted that on many policy issues, the Authority may consider "[t]he

advice of counsel as to the legality of these actions, and whether or not it was worthwhile to defend

them in litigation should that become necessary, would inform these policy decisions in a very

16

direct way." *Id.* at 386. The *Wetzel* court rejected the solicitor's contention that any legal advice would be purely objective and would not leave room for personal beliefs, finding as follows:

> Tough legal questions are not answered mechanically, but rather by the exercise of seasoned judgment. Judgment is informed by experience and perspective, and any evaluation of the risks involved in such a decision (including the determination as to whether it is advisable to pursue litigation) is informed, in turn, by values. Moreover, as the foregoing discussion suggests, these issues are not purely legal; clients employ counsel to assess whether the goals are indeed worth the risks. As such, to be confident in its Solicitor's advice on matters 'intimately related' to Authority policy, the Board must have the right to demand that his loyalties lie with it and its agenda. Given the political ramifications of any attendant legal advice, confidence sometimes may come only with the assurance that the Solicitor shares the same political ideology as the Board. These situations are exactly the types for which the Supreme Court created the *Elrod/Branti* exception.

*Id.* at 386 (internal citations and footnotes omitted). Accordingly, the *Wetzel* court found that because the Authority's solicitor had "meaningful input into decision making concerning a major governmental program," *id.* (internal brackets omitted) (quoting *Brown.* 787 F.2d at 169-70), political party affiliation was an appropriate criterion for the effective performance of the position.

This District also addressed the politically-motivated termination of an attorney in *Siss v. County of Passaic*, 75 F.Supp.2d 325 (D.N.J. 1999) *aff'd*, 234 F.3d 1265 (3d Cir. 2000) (summarily affirmed). In *Siss*, the court found that a former assistant county counsel for the County of Passaic's Department of Law was "not materially different from the positions at issue in *Ness, Mammau*, and *Wetzel*." *Id.* at 338. The assistant county counsel's duties included

> attending meetings of the Board and giving opinions and rulings on questions of law which may arise at Board meetings; advising the Board, the Administrator and all County agencies . . . with respect to their official responsibilities; preparing and/or supervising the legal form and sufficiency of all contracts . . . and all resolutions and actions referred to the Department; representing the County in all . . . litigation and other proceedings and recommending to the Board settlement of any matter; reporting to the Board on the status of

litigation and other proceedings related to its interests; and rendering
such advisory opinions as are requested by the Board.

*Id.* at 338 (internal quotations and brackets omitted). The *Siss* court concluded that "these functions are as 'intimately related' to policy as those associated with the positions at issue in *Ness*, *Mummau*, and *Wetzel*[.]" *Id.* (internal citation omitted).

The Court finds that Plaintiff's Assistant City Attorney position was one in which political affiliation or loyalty could be permissibly considered. The responsibilities and duties of an Assistant City Attorney are not explicitly defined in Orange's Code. Plaintiff contends that the Code's silence means that summary judgment must be denied. Pl. Opp. at 14. However, Plaintiff provides no legal authority for his argument nor could the Court locate any. Thus, the Court must determine the authorized scope of Plaintiff's duties and responsibilities as Assistant City Attorney even if his actual role was more limited. *See Waskovich*, 2 F.3d at 1298 ("The relevant inquiry is to the function of the public office in question and not the actual past duties of the particular employee involved"); *see also Ness*, 660 F.2d 521-22. In sum, the critical question is the breadth of the duties of an Assistant City Attorney.

Section 4-29 of Orange's Code sets forth the duties and responsibilities of the City Attorney. The City Attorney's authority is at least as broad as the city solicitor in *Ness*, so if it were the City Attorney's position at issue, the question would be easily resolved in favor of Defendants. In fact, Plaintiff concedes this point. Pl. Opp. at 13 ("[T]he City Attorney is clearly a confidential policy making employee."). In the Defendants' statement of material facts, Defendants state that "[t]he Assistant City Attorneys for the City of Orange Township performed *many of the same and/or similar duties as the City Attorney* for the Defendant City of Orange" and that *"[t]he Assistant City Attorney for the City of Orange, amongst other things such as drafting Ordinances, Resolutions, litigating matters, and participating in rendering advice and setting*

18

*policy in coordination and in conjunction with the various City departments, renders confidential advice to the Mayor."* City Defs. SOMF ¶¶ 7-8 (emphases added). Plaintiff did not contest these facts in his opposition.

Local Rule 56.1 requires the following:

> On motions for summary judgment, the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion. . . . *The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.*

L. Civ. R. 56.1 (emphasis added). As a result, the Court finds Defendants' facts undisputed as to the duties of the Assistant City Attorney. The Court also notes that Plaintiff did submit his own statement of material facts. If Plaintiff had, in his own submission, contested Defendants' factual assertion with citations to the record, the Court might overlook Plaintiff's failure to comply with Local Civil Rule 56.1. But Plaintiff did not do so. As a result, in light of Defendants' undisputed facts, the Court finds the Assistant City Attorney position is one in which political affiliation or loyalty can be lawfully considered in deciding whether to fire the attorney.

In addition, Plaintiff's own deposition testimony not only supports the foregoing conclusion, it also provides an independent basis for granting summary judgment in favor of Defendants. When asked, "[w]ith the city, what were your specific job responsibilities [as Assistant City Attorney]?" Plaintiff testified:

> Just anything Marvin [Braker, the City Attorney,] wanted me to do. Sometimes he'd say, Lou, head up this case, its in Special Civil Part, I don't want to send it out. Lou, here's the issue, *prepare a*

> *memorandum of law.* Lou, I want you to do *certain resolutions.* I
> want you to *help this department with a resolution*, you know,
> because the departments themselves, they would generate their own
> resolutions, but if it was not in a legal form, didn't conform to our
> legal standards, you make some adjustments. And from time to
> time, here's *an ordinance I want written*, and I'd submit it to him as
> a draft for his review.

D.E. 61-9, Exhibit G ("Childress Dep.") at 23:05-18 (emphases added).[7] Plaintiff also stated that

he did not have an employment contract, but understood that his position was an unclassified at-

will position. *Id.* at 24:10-25. ("It's an at-will position. . . . No question about it.").

The Court finds no legally significant difference in Plaintiff's position as Assistant City

Attorney from the assistant solicitor in *Ness.* By Plaintiff's own admission, the responsibilities of

his position included almost the identical tasks considered in *Ness.* In *Ness*, the court made clear

that "rendering legal opinions, drafting ordinances, [and] negotiating contracts define a position

for which party affiliation is an appropriate requirement." 660 F.2d at 522. Plaintiff described his

responsibilities in very similar terms — including leading cases, drafting ordinances, drafting

resolutions, conducting legal research, and reviewing work from other lawyers. *See* Childress

Dep. 23:05-18, 23:21-24:06.

The Court emphasizes that the parties' descriptions of Plaintiff's role as Assistant City

Attorney are less relevant to the overarching inquiry the Court must conduct into the scope of

potential responsibilities of an Assistant City Attorney under *any* potential administration, present

---

[7] Mayor Warren similarly described the duties of Assistant City Attorneys. Warren stated that
the responsibilities of Assistant City Attorneys "would be outlined by the City Attorney."
Warren Dep. at 83:01-02. Warren also stated that the Assistant City Attorneys do the same work
as the City Attorney, with the City Attorney assigning the work. *Id.* at 83:03-11 ("The same
work but delineates some of the, sometimes the city attorney gets involved in litigation and the
assistant would do the same."). Lastly, Warren stated that he "[a]bsolutely" received
confidential advice from assistant city attorneys. *Id.* at 83:12-15.

or future. *See Ness*, 660 F.2d at 521-22. However, Plaintiff's description of his own responsibilities is different than the factual scenarios in other cases. In those cases, the plaintiff attorney generally argued that his or her role was limited. In this case, by comparison, Plaintiff acknowledged the broad range of duties that he actually engaged in. Plaintiff's admissions clearly support a finding that he was authorized, as an Assistant City Attorney, to engage in a wide range of duties because he actually did so.

The Court finds that the responsibilities Plaintiff described are unambiguously part of the job's general responsibilities under any potential mayoral administration. The broad latitude provided to the mayor and the City Attorney under the City Code further illustrates that political affiliation is an appropriate requirement for the effective performance of the position. Just as the *Ness* court described, the next mayor may require Assistant City Attorneys to function in an even greater policymaking role. *See Ness*, 660 F.2d at 522 ("That one mayor may have chosen not to employ the solicitors in this manner should not stand as a bar to future mayors relying on solicitors to the extent allowed by the Code."). In fact, because it is silent, the Orange Code provides almost no limitation on the scope of Assistant City Attorneys' potential responsibilities. The Court assumes, however, that an Assistant City Attorney's duties and responsibilities could not exceed those of the City Attorney. Yet, beyond this limitation, it appears that an Assistant City Attorney could engage in a broad range of responsibilities, as Plaintiff did in that role. Therefore, the Court finds that the position of Assistant City Attorney is a position for which political affiliation is an appropriate requirement for the effective performance of the position. Accordingly, Defendants are granted summary judgment on Count Two as to Plaintiff's federal constitutional claims.

Plaintiff also brings his claim under Count Two pursuant to "Article I the [sic] Constitution of the State of New Jersey." Compl. ¶ 30. Defendants cite *Battaglia v. Union County Welfare*

*Bd.*, 88 N.J. 48 (N.J 1981), to demonstrate that Plaintiff's claim also falls under the New Jersey Constitution. In *Battaglia*, however, the Supreme Court of New Jersey applied the federal constitution and did not apply any provisions of the state constitution. Therefore, *Battaglia* is inapposite as to the New Jersey Constitutional argument.

Nevertheless, "there is no authority for the proposition that the protections of speech under the New Jersey Constitution are any different from those established by the First Amendment." *McCusker v. City of Atl. City*, 959 F. Supp. 669, 675 (D.N.J. 1996) (citing *Anderson v. Sills*, 143 N.J.Super. 432, 363 A.2d 381 (Ch.Div.1976)). This Court follows the *Siss* court in finding that "if the New Jersey Constitution does protect public employees against patronage dismissals, its protections are no greater than those under the first amendment to the United States Constitution." *Siss*, 75 F. Supp. 2d at 341. Plaintiff has not provided an authority to the contrary. Therefore, Defendants are also granted summary judgment on Count Two as to Plaintiff's state constitutional claims.

Therefore Defendant's motion for summary judgment on Count Two is granted.

### c. **Count Three**

Count Three alleges a civil conspiracy among Defendants Warren, Edwards, and Smith to deprive Plaintiff of his constitutional rights. Specifically, Plaintiff alleges that "Defendants acted in concert to commit the unlawful acts of depriving Plaintiff of his constitutionally protected rights and furthered the conspiracy by their own actions." Compl. ¶ 35. Defendants argue that Plaintiff fails to show that there was any underlying unlawful purpose or lawful purpose to be achieved by unlawful means, and that therefore summary judgment is appropriate. Edwards Br. at 12-14; City Br. at 14-15. Plaintiff fails to address any of Defendants' arguments in his opposition brief.

As an initial matter, Defendants assume that Plaintiff brings his conspiracy claim under New Jersey law. In his complaint, Plaintiff does not specify whether he brings Count Three pursuant to state or federal law. But Plaintiff does not contest in his opposition that his conspiracy count is pursuant to New Jersey law. As a result, the Court looks to state civil conspiracy law.

Under New Jersey law, a civil conspiracy "is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 177, 876 A.2d 253, 263 (N.J. 2005) (internal quotation omitted). Defendants have already been granted summary judgment on Count Two regarding Plaintiff's federal and state constitutional claims. Therefore, under either New Jersey state law or under federal law, Defendants are granted summary judgment on Count Three insofar as the underlying allegations depend on Plaintiff's claim that Defendants violated the federal or state constitution when they fired Plaintiff based on his political affiliation. However, Defendants are denied summary judgment on Count Three insofar as it alleges civil conspiracy to terminate Plaintiff based on the firing of Defendant Smith from Irvington, as alleged in Count One.[8] Accordingly, Defendants' motion for summary judgment on Count Three is granted in part and denied in part.

---

[8] Even though Plaintiff fails to make any arguments in opposition, the Third Circuit has cautioned that "the movant for summary judgment has the burden of demonstrating the absence of genuine issues of material fact . . . and even if the opposing party fails to file contravening affidavits or other evidence, summary judgment must still be 'appropriate' and will be denied where the movant's own papers demonstrate the existence of material factual issues." *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 790 (3d Cir. 1978) (internal citations omitted).

Here, because Defendants failed to provide any analysis of the underlying factual issues regarding Smith's termination from Irvington in Count One, the Court similarly cannot grant summary judgment on the related theory in Count Three.

### d. Count Four

Count Four alleges a violation of substantive due process under the New Jersey Constitution. Specifically, Plaintiff claims that the "individual Defendants [sic] actions were arbitrary and capricious and an exercise of the power of government for purposes of oppression."[9] Compl. ¶ 40. Defendants argue that Plaintiff has not asserted any rights that are entitled to substantive due process protection. Plaintiff fails to address any of Defendants' arguments in his opposition and his Complaint fails to identify the vehicle by which he brings this claim.

"Principles of substantive due process are found in Article I, [Section] I of the New Jersey Constitution of 1947, as well as in the federal constitution." *Hutton Park Gardens v. Town Council of Town of W. Orange*, 68 N.J. 543, 560 (N.J. 1975). Generally "[i]n cases raising substantive due process claims under [the New Jersey Constitution], [the Supreme Court of New Jersey] uses the standards developed by the United States Supreme Court under the federal Constitution." *Roman Check Cashing, Inc. v. New Jersey Dep't of Banking & Ins.*, 169 N.J. 105, 110 (N.J. 2001) (internal quotation omitted). Additionally, "[t]he elements of a substantive due process claim under the CRA are the same as those under § 1983." *Filgueiras v. Newark Pub. Sch.*, 426 N.J. Super. 449, 468 (App. Div. 2012). Accordingly, this Court examines Plaintiff's substantive due process claim under the New Jersey Constitution in the same way that it would examine such a claim under the federal constitution.

---

[9] The Court assumes that Plaintiff brings Count Four pursuant to the New Jersey Civil Rights Act ("NJCRA"). N.J.S.A. 10:6-2(c) (providing relief provides relief to "[a]ny person who has been deprived of . . . any substantive rights . . . secured by the Constitution *or laws of this State*." (emphasis added)). Oddly, Plaintiff requests "reasonable attorney fees and cost of this action pursuant to 42 U.S.C.A. §1988." Compl. ¶ 40. However, Section 1988 only allows attorneys' fees when enforcing the provisions of Sections 1981, 1982, 1983, 1985, and 1986. 42 U.S.C. § 1988(b). These sections, however, do not apply to violations of a *state* constitution, which is the basis for Count Four.

"The Due Process Clause of the Fourteenth Amendment provides that no state shall 'deprive any person of life, liberty, or property, without due process of law.'" *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 138 (3d Cir. 2000) (quoting U.S. Const. amend. XIV). "While on its face this constitutional provision speaks to the adequacy of state procedures, the Supreme Court has held that the clause also has a substantive component." *Id.* at 138–39. However, litigants face substantial burdens to show violations of substantive due process. As the Supreme Court of New Jersey has described, "substantive due process is reserved for the most egregious governmental abuses against liberty or property rights, abuses that shock the conscience or otherwise offend . . . judicial notions of fairness . . . and that are offensive to human dignity. With the exception of certain intrusions on an individual's privacy and bodily integrity, the collective conscience of the courts is not normally shocked." *Rivkin v. Dover Twp. Rent Leveling Bd.*, 143 N.J. 352, 366 (1996) (emphases added) (internal quotations, citations, and brackets omitted). The Third Circuit has instructed that when a plaintiff challenges an adverse employment decision on substantive due process grounds, first the court must determine whether the property interest deprived is "fundamental," and if it is, "then substantive due process protects the plaintiff from arbitrary or irrational deprivation, regardless of the adequacy of the procedures used." *Id.* at 142. The Third Circuit has further guided that "a property interest that falls within the ambit of substantive due process may not be taken away by the state for reasons that are arbitrary, irrational, or tainted by improper motive, or by means of government conduct so egregious that it shocks the conscious." *Id.* at 139 (internal quotations and citations omitted); *Chainey v. St.*, 523 F.3d 200, 219 (3d Cir. 2008) ("To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience." (citation omitted)).

Defendants argue that Plaintiff has no substantive due process claim to his employment as Assistant City Attorney because he had no right to this job and because his termination did not infringe on any property or liberty interest. Plaintiff admits that he had no employment contract and was an at-will, unclassified employee. Pl. SOMF ¶ 2; Childress Dep. 24:10-25. ("It's an at-will position. . . . No question about it."). Courts have repeatedly held that "[a]n employee hired at will has no protected interest in his employment and may not prevail on a claim that his or her discharge constituted a violation of property rights." *Filgueiras v. Newark Pub. Sch.*, 426 N.J. Super. 449, 469–70 (App. Div. 2012); *Robertson v. Fiore*, 62 F.3d 596, 601 (3d Cir. 1995); *see also Nicholas*, 227 F.3d at 142-43 (holding that even a tenured public college professorship is not a "fundamental" property interest entitled to substantive due process protections). Accordingly, it is clear that Plaintiff had no substantive property interest violated by his termination. For these reasons, Defendants' motions for summary judgment on Count Four are granted.

### e.  Count Five

Count Five alleges a breach of the implied covenant of good faith and fair dealing based on Plaintiff's claim that "[i]nherent in the City of Orange Township's Employee Handbook of Personnel Policies and Procedures a [sic] duty of good faith and fair dealing pursuant to Federal, State and local law." Compl. ¶ 42. Defendants argue that Plaintiff had no employment contract and therefore there was no breach. Plaintiff offers no arguments in opposition.

Under New Jersey law, every contract "contains an implied covenant of good faith and fair dealing." *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420 (N.J. 1997). This means that "[i]n every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]" *Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 130 (1965) (internal quotation

omitted). "To recover for breach of the implied covenant, a plaintiff must prove that: (1) a contract exists between the parties; (2) the plaintiff performed under the terms of the contract; (3) the defendant acted in bad faith with the purpose of depriving the plaintiff of rights or benefits under the contract; and (4) the defendant's actions caused the plaintiff to sustain damages." *Luongo v. Vill. Supermarket, Inc.*, 261 F. Supp. 3d 520, 531–32 (D.N.J. 2017) (citations omitted).

Here, Plaintiff admitted that he was an at-will employee. Childress Dep. 24:10-25 (stating, in part, that "I did not [have an employment contract with the City of Orange]" and that his position was an "at-will position. . . . No question about it."). This admission is dispositive because under New Jersey law, "[i]n the absence of a contract, there can be no breach of an implied covenant of good faith and fair dealing." *Noye v. Hoffmann-La Roche Inc.*, 238 N.J. Super. 430, 434 (App. Div. 1990); *accord Luongo*, 261 F. Supp. 3d at 532. In fact, "[i]n New Jersey, an employer may fire an employee for good reason, bad reason, or no reason at all under the employment-at-will doctrine." *Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385, 397 (N.J. 1994) (citation omitted).

Although not argued by Plaintiff, the Court also notes that the Employee Handbook did not create a contract between Plaintiff and any Defendant. In New Jersey, an employee handbook may create an employment contract in some instances. *See Woolley v. Hoffmann-La Roche, Inc.*, 99 N.J. 284, 309, *modified*, 101 N.J. 10 (N.J. 1985); *see also Witkowski*, 136 N.J. at 399. The Supreme Court of New Jersey has also made clear that "if the employer, for whatever reason, does not want the manual to be capable of being construed by the court as a binding contract, there are simple ways to attain that goal" including "the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual." *Woolley*, 99 N.J. 284 at 30. In other words, an effective disclaimer can be used to counter any claim of an enforceable contract.

The Employee Handbook here explicitly states, in a section titled "At-Will Employment Doctrine," the following:

> *Employment with the City is on an "at-will" basis. This means that employment is for no specific term and can be terminated by the employee or the City at any time for any reason or for no reason, with or without notice;* subject to provisions of the New Jersey Department of Personnel. All employees, whether regular or temporary, are at-will employees.

> *Policies included in this Handbook do not constitute a contract of employment between the City and its employees. No contractual obligation or liability on the part of the City is intended; no promise of any kind is made.* The City retains the right, in its sole discretion, to change any policy, procedure, term of employment, or working condition at any time to the extent permitted by the applicable State and Federal laws.

Employee Handbook at 9 (emphases added).[10] In sum, Plaintiff recognized that he was an at-will employee and the Employee Handbook explicitly disclaims that it creates any contract of employment. For these reasons, Defendants' motions for summary judgment on Count Five are granted.

---

[10] The Court notes that when attaching the Employee Handbook as an exhibit, Plaintiff inexplicably left out page nine—which details that the provisions of the Employee Handbook do not create an employment contract. *See* D.E. 61-3.

## V. CONCLUSION

For the reasons set forth above and for good cause shown, Defendants' motions for summary judgment on Count One are **DENIED**. Defendants' motions for summary judgment on Counts Two, Four, and Five are **GRANTED**. Defendants' motions for summary judgment on Count Three is **GRANTED in part** and **DENIED in part**.[11] An appropriate Order accompanies this Opinion.

Date: March 19, 2018

_____
John Michael Vazquez, U.S.D.J.

---

[11] As detailed in the attached Order, Defendants are granted summary judgment on Count Three insofar as the underlying allegations depend on Plaintiff's claim that Defendants violated the federal or state constitutions when they fired Plaintiff based on his political affiliation. However, Defendants are denied summary judgment on Count Three insofar as it alleges civil conspiracy to terminate Plaintiff based on the firing of Defendant Smith from Irvington, as alleged in Count One.